*This opinion is subject to revision before final publication in the Pacific Reporter*

**2015 UT 30**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

WADE HERLAND, Personal Representative
of the estate of Neely Creager,
*Appellant,*

*v.*

TRAVIS IZATT,

*Appellee.*

No. 20120586
Filed January 30, 2015

Second District, Farmington
The Honorable Glen R. Dawson
No. 080700229

Attorneys:

Jack C. Helgesen, Kurt M. Helgesen, Clearfield, for appellant

Paul M. Belnap, David E. Brown, Salt Lake City, for appellee

CHIEF JUSTICE DURRANT authored the opinion for the Court, in which ASSOCIATE CHIEF JUSTICE NEHRING, JUSTICE DURHAM, JUSTICE PARRISH, and JUSTICE LEE joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1    The right to bear arms is enshrined in both the United States and Utah Constitutions. But with that right comes responsibilities—a principle our Legislature has recognized by placing certain restrictions on gun ownership. These include restrictions on supplying firearms to minors and individuals who are incompetent

or impaired.[1] In this case we are asked to determine whether gun owners have a duty in tort to exercise reasonable care in supplying their guns to intoxicated individuals. We conclude a gun owner does have such a duty. Supplying an intoxicated individual with a gun, just as supplying a car to such a person, creates a foreseeable risk of harm. But the fact that gun owners have such a duty does not mean that they will necessarily be liable for damages when those individuals injure themselves, because in most cases the intoxicated individual's negligence will likely exceed that of the gun owner as a matter of comparative negligence.

¶2    The central facts of this case are as follows: after a night of heavy drinking at a party, Neely Creager picked up a loaded handgun and shot herself in the head—a shooting that both parties agree for purposes of this appeal was accidental. Ms. Creager's estate filed this negligence action against Travis Izatt, who was the host of the party and the owner of the handgun. Her estate premised the suit on multiple theories of liability, including general negligence, negligent entrustment, and premises liability. The district court granted summary judgment for Mr. Izatt, concluding that he owed no duty to Ms. Creager. We reverse and conclude that Mr. Izatt may owe a duty to Ms. Creager, who at the time she obtained his gun was severely impaired and posed a risk to herself and to the rest of those attending the party. But this conclusion depends upon how the fact finder below resolves a key factual dispute about whether Ms. Creager gained access to the gun due to an affirmative act or an omission. We emphasize that our holding today concerns only the *duty* owed by Mr. Izatt to Ms. Creager; we do not decide questions of breach or proximate cause, such as whether Mr. Izatt did, in fact, exercise reasonable care. Nor do we decide the question of whether any fault on the part of Mr. Izatt exceeded the fault of Ms. Creager. For the resolution of these questions we remand for further proceedings consistent with this opinion.

---

[1] For instance, the Legislature has made it illegal to encourage an intoxicated individual to carry a firearm. *See* UTAH CODE § 76-10-528 (prohibiting the carrying of "a dangerous weapon while under the influence of alcohol or a controlled substance"); *id.* § 76-2-202 (making it a crime to "solicit[], request[], command[], encourage[], or intentionally aid[] another person . . . in conduct which constitutes an offense").

## Background

¶3    On May 5, 2006, Mr. Izatt invited a few friends over to his home for a night of drinking and partying. Kimberly West, who was one of his friends, invited Ms. Creager, a thirty-year-old woman, to the party. Though Mr. Izatt may have met Ms. Creager on a few previous occasions, he had never spoken with her prior to the party. And unbeknownst to him, Ms. Creager was suffering from severe depression and was on a variety of medications. The party lasted for several hours, and the guests, including Ms. Creager, became intoxicated. In fact, Ms. Creager attained a blood alcohol content of 0.25.

¶4    During the course of the evening, Ms. Creager gained possession of Mr. Izatt's handgun.[2] Precisely how she came into possession of the firearm is unclear, as Mr. Izatt gave different accounts to a 911 dispatcher, a police officer, and in his deposition. After calling 911, he initially told the dispatcher that Ms. Creager "took a gun out of [his] cabinet, put it up to [her] temple and pulled the trigger." But later during the same call, he stated that she "took the handgun off of [his] counter" and suggested to the group that they play Russian roulette. Mr. Izatt said he cautioned her that the gun was not a revolver, so it would surely fire if the trigger were pulled. He also noted to the dispatcher that "[his] handgun is kinda . . . always out."

¶5    When the police arrived on the scene, one of the officers questioned Mr. Izatt about the events. Mr. Izatt told the officer that while playing pool with Ms. Creager, he mentioned to her that he won a shotgun in a pool tournament. He then asked her if she wanted to see it. She answered yes, so the two went to his gun safe to view the shotgun. Once there, Mr. Izatt opened the safe and showed her his guns. There are conflicting versions of what happened next. Under one account, Ms. Creager picked up one of the handguns. Mr. Izatt warned her that the gun was loaded. Mr. Izatt then closed the gun safe, apparently without noticing that Ms. Creager did not put the handgun back in the safe. Mr. Izatt claimed he then left the area, heard a muffled gun shot, and turned around to see Ms. Creager lying on the floor.

---

    [2] Mr. Izatt owned the firearm legally and has possessed a Utah concealed weapons permit since 1998. He received gun training in the Army, through the California Police Academy, and through a Utah gun safety training course.

¶6    Mr. Izatt told a different story in his deposition. He stated that while he and Ms. Creager were viewing his guns in the safe, she asked if she could see his shotgun. He gave her the shotgun, and after holding it briefly, she gave it back to him. As he went to place the shotgun back in the safe, Ms. Creager grabbed the handgun from the safe. Mr. Izatt quickly took the handgun back from her, however, and he placed it back in the safe. Although he could not remember whether it was he or Ms. Creager who actually closed the safe, Mr. Izatt claims he "heard the tumblers lock when [he] turned the lock." According to him, Ms. Creager then regained access to the handgun without Mr. Izatt knowing, and then followed him out of the room. A few moments later, Mr. Izatt heard a gunshot.

¶7    In any case, Ms. Creager shot herself in the head, in what the medical examiner described as a contact-range wound that left "a visible muzzle imprint abrasion." The shot killed her. Ms. Creager's estate has argued that she shot herself accidentally, and for purposes of this appeal, Mr. Izatt does not dispute this point.

¶8    The police did not bring criminal charges against Mr. Izatt, but Ms. Creager's estate filed a wrongful death action against him in April 2008, alleging that he was negligent in "allowing her to have access to his loaded handgun when she was severely intoxicated." Mr. Izatt filed a Motion for Summary Judgment on November 30, 2011, arguing that he did not owe any legal duty to Ms. Creager. The district court granted summary judgment in favor of Mr. Izatt, holding that he did not owe Ms. Creager any legal duty. Ms. Creager's estate timely appealed. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j).

**Standard of Review**

¶9    "The determination of whether a legal duty exists . . . is a purely legal question"[3] that requires "an examination of the legal relationships between the parties."[4] And we review "a [lower] court's legal conclusions and ultimate grant or denial of summary judgment for correctness and view[] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."[5] Summary judgment is only appropriate if there

---

[3] *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 14, 143 P.3d 283.

[4] *Reighard v. Yates*, 2012 UT 45, ¶ 9, 285 P.3d 1168 (internal quotation marks omitted).

[5] *Jones & Trevor Mktg., Inc. v. Lowry*, 2012 UT 39, ¶ 9, 284 P.3d 630 (first alteration in original) (internal quotation marks omitted).

are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[6]

## Analysis

¶10 As we explain further below, the district court erred in concluding that Mr. Izatt did not owe Ms. Creager a duty of care under any of the factual scenarios advanced by the parties. Recently, in *B.R. ex rel. Jeffs v. West*, we identified five key factors that inform our analysis of whether a duty of care exists.[7] Four of these factors support imposition of a duty on Mr. Izatt in this case, and there was a dispute of material fact regarding the fifth. In framing the applicable duty, we conclude that gun owners have a duty to exercise reasonable care in supplying their guns to others—such as children and incompetent or impaired individuals—whom they know, or should know, are likely to use the gun in a manner that creates a foreseeable risk of injury to themselves or third parties.

¶11 We stress that our analysis is confined to the establishment of a duty of care in this general category of cases. We make no ruling today concerning any potential breach of duty or causation, as these are fact-sensitive issues to be resolved on remand. In fact, those who are inebriated and seek to sue another for injuries brought on by their own actions may find it difficult to ultimately prevail in a negligence action, for to do so they must establish under Utah's comparative negligence framework that the negligence of the gun owner was greater than their own.

## I. Duty of Care

¶12 We begin by reiterating the baseline principle we stated in *Beach v. University of Utah*—that "a party does not [ordinarily] have an affirmative duty to care for another."[8] We adopted this principle from section 314 of the *Restatement (Second) of Torts*, which states: "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." And comment c to section 314 adds that this rule "is applicable irrespective of the gravity of the danger to which the other is subjected and the insignificance of the trouble, effort, or expense of giving him aid or protection."

---

[6] UTAH R. CIV. P. 56(c).

[7] 2012 UT 11, ¶¶ 5–9, 275 P.3d 228.

[8] 726 P.2d 413, 415 (Utah 1986).

¶13 But action may be necessary where there is an affirmative duty to aid or protect the endangered individual.[9] In *B.R. ex rel. Jeffs v. West*, we identified five relevant factors that guide our assessment of whether a duty exists.[10] These include

> (1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission; (2) the legal relationship of the parties; (3) the foreseeability or likelihood of injury; (4) public policy as to which party can best bear the loss occasioned by the injury; and (5) other general policy considerations.[11]

In listing these factors, we noted that "[n]ot every factor is created equal . . . . [S]ome factors are featured heavily in certain types of cases, while other factors play a less important, or different, role."[12] For instance, in *Jeffs*, we were asked to address the question of whether healthcare providers have a duty to nonpatients to exercise reasonable care when prescribing medication to patients.[13] In that context, the second factor—the legal relationship of the parties—played no role because there is no "special relationship or physician-patient relationship" between a healthcare provider and a nonpatient.[14] Despite this fact, we concluded that healthcare providers did owe such a duty because each of the other four factors weighed in favor of holding so.[15] We engage in this same analytical exercise in this case and conclude that four factors support imposing a duty, and the remaining factor also supports imposing a duty depending on how the fact finder resolves a key factual dispute on remand. We discuss each factor in turn.

### A. Foreseeability

¶14 Because the likelihood of injury is high when a gun owner supplies a gun to an incompetent or impaired individual, the foreseeability factor weighs in favor of imposing a duty in this case.

---

[9] *See* RESTATEMENT (SECOND) OF TORTS § 314A (1965).

[10] 2012 UT 11, ¶ 5, 275 P.3d 228.

[11] *Id.* (internal quotation marks omitted).

[12] *Id.*

[13] *Id.* ¶ 6.

[14] *Id.* ¶ 19.

[15] *Id.* ¶¶ 7, 20.

In framing the appropriate inquiry for this factor, we noted in *Jeffs* that

> foreseeability in [our] duty analysis is evaluated at a broad, categorical level. . . . [It] does not question the specifics of the alleged tortious conduct such as the specific mechanism of the harm. It instead relates to the general relationship between the alleged tortfeasor and the victim and the general foreseeability of harm.[16]

By instead analyzing foreseeability in a "case-specific and fact-intensive" manner, the parties in *Jeffs* had "conflate[d] the kind of foreseeability relevant to the duty analysis with the foreseeability inquiries significant to matters of breach and proximate cause."[17] We thus clarified that "[t]he appropriate foreseeability question for duty analysis is whether a category of cases includes individual cases in which the likelihood of some type of harm is sufficiently high that a reasonable person could anticipate a general risk of injury to others."[18]

¶15 In this case, foreseeability weighs in favor of imposing a duty when properly framed. The relevant category of cases here consists of gun owners who are negligent in supplying their guns to others who then injure themselves or third parties.[19] And the

---

[16] *Id.* ¶ 25 (internal quotation marks omitted).

[17] *Id.* ¶¶ 24, 28; *see also* Andrew J. McClurg, *Armed and Dangerous: Tort Liability for the Negligent Storage of Firearms*, 32 CONN. L. REV. 1189, 1237–41 (2000) (describing multiple cases in which, in the author's view, courts approached the foreseeability analysis much too narrowly and thus precluded recovery in cases involving firearms).

[18] *Jeffs*, 2012 UT 11, ¶ 27.

[19] This category of cases is described in more general terms in section 390 of the *Restatement (Second) of Torts*, which states,

> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

Continued

foreseeability question is "whether there are circumstances within [this] category in which [such individuals] could foresee injury."[20] We believe there are such circumstances, as myriad cases we discuss below have already established.

¶16 As owners of dangerous weapons (particularly handgun owners) are well aware, supplying others with such weapons may create a foreseeable risk of harm. For instance, where a firearm is given to an intoxicated individual, the risk of harm to others is clearly foreseeable.[21]

¶17 "Because the class of cases [therefore] includes some in which a risk of injury to third parties is reasonably foreseeable . . . , the foreseeability factor weighs in favor of imposing a duty"[22] on individuals who supply incompetent or impaired individuals with a gun. It is not necessary, as Mr. Izatt contends, that he must have been able to foresee the specific *sequence* of harm in this case. Whether Ms. Creager's possession and use of the gun was a foreseeable consequence of Mr. Izatt's actions, and whether Ms. Creager's use of medications contributed to the injury, are

---

And particularly instructive to this case is comment c to section 390, which adds that

> [i]f . . . the person to whom the chattel is supplied is one of a class which is legally recognized as so incompetent as to prevent them from being responsible for their actions, the supplier may be liable for harm suffered by him, as when a loaded gun is entrusted to a child of tender years. So too, if the supplier knows that the condition of the person to whom the chattel is supplied is such as to make him incapable of exercising the care which it is reasonable to expect of a normal sober adult, the supplier may be liable for harm sustained by the incompetent although such person deals with it in a way which may render him liable to third persons who are also injured.

[20] *Jeffs*, 2012 UT 11, ¶ 27.

[21] *See Kitchen v. K-Mart Corp.*, 697 So. 2d 1200, 1207 (Fla. 1997) ("Not surprisingly, this Court also has recognized that the high degree of risk inherent in the use of a dangerous instrument escalates when such an instrument is used by a person who is intoxicated and unable to exercise caution.").

[22] *Jeffs*, 2012 UT 11, ¶ 28.

questions of proximate cause. Likewise, in our assessment of duty we do not decide whether Mr. Izatt did *in fact* exercise reasonable care or whether he should have foreseen the danger posed by his conduct. These are questions that go to Mr. Izatt's breach of duty. We decide duty as a matter of law, and as to foreseeability, failing to exercise reasonable care in supplying a gun to incompetent or impaired individuals creates a foreseeable risk of harm. Accordingly, this factor weighs in favor of establishing a duty.

¶18 Recognizing this category of cases as giving rise to a duty does not, however, provide blanket protection to every individual who becomes voluntarily intoxicated, as we have enunciated in several previous cases.[23] But there are circumstances in which the alleged tortfeasor assumes a duty of care to protect others, including from the actions of someone who is voluntarily intoxicated. The *Restatement (Second) of Torts* provides an example:

> A, who makes a business of letting out boats for hire, rents his boat to B and C, who are obviously so intoxicated as to make it likely that they will mismanage the boat so as to capsize it or to collide with other boats. B and C by their drunken mismanagement collide with the boat of D, upsetting both boats. B, C, and D are drowned. A is subject to liability to the estates of B, C, and D under the death statute, although the estates of B and C may also be liable for the death of D.[24]

Although this is an example of liability imposed on a business supplier, the principle applies equally "to anyone who supplies a chattel for the use of another. It applies to sellers, lessors, donors or lenders, and to all kinds of bailors, irrespective of whether the bailment is gratuitous or for a consideration."[25] In fact, courts have

---

[23] *Horton v. Royal Order of the Sun*, 821 P.2d 1167, 1169 (Utah 1991) (holding that under Utah's Dramshop Act a furnisher of alcohol is liable only for injuries of *third parties* and not the intoxicated individual); *Beach v. Univ. of Utah*, 726 P.2d 413, 415 (Utah 1986) ("[O]ne has no duty to look after the safety of another who has become voluntarily intoxicated and thus limited his ability to protect himself." (internal quotation marks omitted)).

[24] RESTATEMENT (SECOND) OF TORTS § 390, cmt c, illus. 7 (1965).

[25] *Id*. cmt. a.

imposed liability on individuals for allowing the use of guns by those who are incompetent or impaired by way of intoxication[26] or their age.[27]

¶19 And although we have not yet recognized such a duty in Utah, our prior caselaw has affirmed the foreseeable nature of similar conduct. In *Wilcox v. Wunderlich*, we discussed the doctrine of negligent entrustment in a case involving minors who killed a young child while operating a vehicle.[28] And although we held in that case that the parent was not liable because the car was owned by the minor children, and thus the car could not be entrusted to them, we affirmed the viability of a negligence action where

> an owner having control of the car [e]ntrusts it to a minor under the prescribed age, who by ordinance or statute is forbidden to drive a car, or to one who is known to be inexperienced or infirm, or otherwise under disability, and for such reason either not legally qualified or able to properly drive a car, and the parent or owner could or ought to anticipate that so [e]ntrusting the car to be driven on a public street likely would result in injury to others.[29]

In his dissent, Justice Cherry also analogized the entrustment of vehicles to the entrustment of firearms and stated that "[l]oaded firearms are dangerous, if not properly handled. And one is careless who [e]ntrusts a loaded gun to a 12 year old child; he should first

---

[26] *See, e.g.*, *Howard Bros. of Phenix City, Inc. v. Penley*, 492 So. 2d 965, 966, 968–69 (Miss. 1986) (imposing a duty on a retailer who provided a pistol and ammunition to a nineteen-year-old man who was under the influence of alcohol and drugs); *Bernethy v. Walt Failor's, Inc.*, 653 P.2d 280, 283 (Wash. 1982) ("The basis for our imposing this general duty is that one should not furnish a dangerous instrumentality such as a gun to an incompetent. Most of the case law relates to gun sales to children or entrusting an automobile to an intoxicated person. The principle of section 390 [of the *Restatement (Second) of Torts*], however, applies equally well to one who is incompetent due to intoxication." (citation omitted)).

[27] *E.g.*, *Masone v. Gianotti*, 54 A.D.2d 269, 274–75 (N.Y. App. Div. 1976) (imposing liability on parents for providing their twelve-year-old child with a BB gun and ammunition).

[28] 272 P. 207, 216 (Utah 1928).

[29] *Id.*

draw the charge. Therefore, if it goes off in the hands of such child, inflicting harm on another, he must answer for the wrong."[30]

¶20 In sum, the foreseeability factor weighs in favor of establishing a duty, since supplying an incompetent or impaired individual with a gun creates a foreseeable risk of harm.

*B. Public Policy*

¶21 Ms. Creager's estate argues that Utah public policy favors imposing a duty on individuals who supply incompetent or impaired individuals with a gun. We agree.

¶22 To begin, Mr. Izatt's central contention is that the statutory scheme favors unrestricted gun possession in one's own home. In support of this argument, he cites two Utah statutes. First, he cites Utah Code section 76-10-500, which exclusively reserves to the State the right to regulate firearms—it prevents "local authorities or state entities"[31] from restricting others from "owning, possessing, purchasing, selling, transferring, transporting, or keeping any firearm at his place of residence, property, business, or in any vehicle lawfully in his possession or lawfully under his control."[32] Second, he cites Utah Code section 76-10-511, which makes the possession of a loaded firearm permissible "(1) at the person's place of residence, including any temporary residence or camp; or (2) on the person's real property." While it is certainly true that the Legislature has reserved the right to regulate firearms and has made it legal to possess a loaded firearm in one's own home, it has also imposed certain restrictions on firearm use and ownership.

¶23 We conclude that the Legislature has expressed two important public policy points through the passage of various statutes: first, that firearms are not to be provided to individuals who are likely to harm others, including minors and persons that are violent, mentally ill, or impaired; second, that firearms cannot be carried under every circumstance, even if the gun owner has a concealed weapons permit. As discussed below, the Utah Legislature

---

[30] *Id.* at 221 (Cherry, J., dissenting) (internal quotation marks omitted).

[31] UTAH CODE § 76-10-500(2).

[32] *Id.* § 76-10-500(1)(a).

has expressed these policies by restricting (1) *who* may possess firearms, and (2) *how* firearms may be carried.[33]

¶24 First, the code restricts *who* may possess firearms. For instance, it is a crime to "sell, transfer, or otherwise dispose of any firearm" to restricted persons, such as felons, mentally ill persons, and those using illegal substances.[34] It is also a crime for parents or guardians to allow a minor to handle a firearm unless there is parental consent and supervision.[35] And even if there is parental consent and supervision, it is *still* a crime to provide a minor with a firearm if the minor is violent.[36] Moreover, minors under age eighteen are categorically prohibited from possessing handguns.[37] Finally, the code treats the possession of firearms by minors so restrictively that parents have an affirmative duty to remove the firearms from their minors' possession when they are aware that the firearms are possessed unlawfully.[38]

¶25 Second, the code restricts *how* firearms may be carried. For instance, it is a crime to carry a firearm while intoxicated—whether the owner of the weapon is inside or outside of the home.[39] This section also provides that "[i]t is not a defense to prosecution under this section that the person . . . has a valid permit to carry a concealed firearm."[40] Mr. Izatt argues that with respect to firearms, this section applies only *outside* the home, since possession of a firearm inside of a home is expressly permitted by another code

---

[33] We note that some of these restrictions apply not just to guns, but to dangerous weapons generally. The Utah Code defines "[d]angerous weapon" as "(i) a firearm; or (ii) an object that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 76-10-501(6)(a). But since this case concerns only the duty of care owed by gun owners, we limit our discussion to firearms.

[34] *Id.* § 76-10-503(8)(a).

[35] *Id.* §§ 76-10-509(1)–(2), -509.4, -509.5.

[36] *Id.* § 76-10-509.6.

[37] *Id.* § 76-10-509.4(1).

[38] *Id.* § 76-10-509.7.

[39] *Id.* § 76-10-528(1).

[40] *Id.* § 76-10-528(2)(b).

section.[41] We disagree because his argument strains the reading of these statutes. Specifically, the section of the code permitting possession of firearms "at [a] person's place of residence" restricts this right "as otherwise prescribed in this part."[42] And as already noted, one of the "part[s]" imposing such a restriction is where the person is intoxicated.[43] So although a person may possess a firearm "at the person's place of residence," that right is limited in that the person may not "carr[y] [the firearm] while under the influence of alcohol or a controlled substance."[44]

¶26 By extension, the Utah Code also makes it illegal to encourage other intoxicated individuals to carry firearms. Section 76-2-202 states that "[e]very person, acting with the mental state required for the commission of an offense who directly commits the offense, who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct." Ms. Creager argues that this section makes it a crime to encourage another to violate section 76-10-528; in other words, that it makes it a crime to encourage or aid others to carry a firearm while intoxicated. Mr. Izatt makes no argument to rebut this contention. And indeed, section 76-2-202 does criminalize such behavior where the person encouraging the intoxicated individual to carry a firearm has the same mental state required under the statute and the person aiding the intoxicated individual did something more than maintain a "passive presence."[45] Under these two statutes it is illegal, when the specified elements are shown, to encourage an intoxicated individual to carry a firearm.

¶27 And unless the owner of the weapon has a concealed weapons permit,[46] the Utah Code also makes it a crime to carry an

---

[41] *See id.* § 76-10-511 ("Except for persons described in Section 76-10-503 and 18 U.S.C. Sec. 922(g) and as otherwise prescribed in this part, a person may have a loaded firearm: (1) at the person's place of residence, including any temporary residence or camp; or (2) on the person's real property.").

[42] *Id.*

[43] *Id.* § 76-10-528.

[44] *Id.*

[45] *State ex rel. V.T.*, 2000 UT App 189, ¶ 16, 5 P.3d 1234.

[46] UTAH CODE § 76-10-523(2).

un-encased firearm "in or on a place other than the person's residence, property, [or] vehicle."[47] Furthermore, even if the owner has a permit to carry a firearm, it cannot be carried into protected areas such as schools[48] and airports,[49] and it may not be carried into churches, private residences, and other properties when notice is given to the owner of the firearm.[50]

¶28 In sum, the Legislature has made it clear that firearms are not to be supplied to incompetent or impaired individuals, and it has also restricted how a firearm may be carried. To further these policies, the Legislature has also made the criminal penalties applicable to firearms violations more severe than other dangerous weapons violations.[51]

¶29 With this public policy background in mind, we are asked to decide whether it favors imposing a duty of care. We have held that a duty of care exists when an owner entrusts a vehicle to an incompetent individual, such as a minor.[52] But that duty arose from

---

[47] *Id*. § 76-10-504(1).

[48] *Id*. § 76-10-505.5.

[49] *Id*. § 76-10-529.

[50] *Id*. § 76-10-530.

[51] *Compare id.* § 76-10-504(1) (making it a class B misdemeanor to carry a concealed dangerous weapon), *with id*. § 76-10-504(2)–(3) (making it either a class A misdemeanor or second degree felony to carry a concealed firearm or an unlawfully possessed short-barreled shotgun or rifle). *See also id*. § 76-10-503(2) (providing differing penalties depending on whether the weapon is a "firearm" or "any dangerous weapon other than a firearm.")

[52] *Lowder v. Holley*, 233 P.2d 350, 353 (Utah 1951) ("The obvious intent of the legislature [in passing the motor-vehicle owner liability statute] was to protect innocent third parties from the negligence of minors to whom cars are furnished or who are permitted by the owners of the cars to drive them, by holding the owners responsible therefor. In most instances actual permission by the owner to the minor to drive the car is impossible of direct proof. It is, of course, in the interest of the owner after an accident to deny such permission. It is not necessary, therefore, in order for a plaintiff to establish a case against an owner of a car to prove that express consent to drive the car was given to the minor. It may be implied from past conduct."). *But see Rollins v. Petersen*, 813 P.2d 1156, 1164 (Utah 1991) ("[M]ere

Continued

Utah statutes, and here we are asked to impose a duty as a matter of Utah common law. Utah public policy *also* supports imposition of a duty as a matter of Utah common law. As we stated in *Mugleston v. Glaittli*, an automobile may "be regarded as [a dangerous instrumentality] in the hands of an incompetent driver, and an owner therof who knowingly entrusts its operation to such a driver is liable, *even in the absence of statute*, for the proximate consequences of its operation in such hands."[53] Furthermore, a duty arises as a matter of common law where the owner *should know* about the entrustee's incompetence: "If [a parent] ha[s] reason to believe that his son [is] a careless driver, from observation of his habits, or otherwise, it would be his duty to deny the son the use of the car."[54]

¶30 This principle extends outside of the automobile context, as evidenced by the Legislature's efforts to restrict the possession and use of firearms by those who are incompetent or incapable of handling such weapons responsibly. And beyond the framework of the statutes themselves, we believe that it is sound public policy to impose a duty here. As we discuss further below, the dangers posed by firearms are great and the costs of requiring their owners to exercise reasonable care in supplying impaired or incompetent individuals with them are relatively small.[55]

¶31 As a final matter, we note that third parties, as well as the entrustees themselves (first parties) may recover under the theory of negligent entrustment, though there is a jurisdictional split on this point given the social policies pulling in either direction.[56] In Utah,

---

ownership of an automobile does not render the owner liable for the negligent actions of the driver.").

[53] 258 P.2d 438, 439 (Utah 1953) (emphasis added).

[54] *Reid v. Owens*, 69 P.2d 265, 265–66 (Utah 1937) (recognizing a duty in a wrongful death negligence action not premised on Utah's motor-vehicle owner liability statute).

[55] *Infra* ¶ 39.

[56] Some jurisdictions have concluded that public policy favors first-party recovery for voluntary intoxicated individuals in negligent entrustment cases involving automobiles, reasoning as follows:

> We recognize that voluntary intoxication is socially undesirable conduct and that individual responsibility to refrain from such conduct should be promoted.

Continued

third-party recovery has long been permitted under the theory of negligent entrustment.[57] As to recovery for the entrustees themselves, we note that the Utah Dramshop Act prevents first-party recovery against the furnisher of the alcohol.[58] That said, nothing in our statutes, and nothing in our caselaw, prevents first-party recovery against one who supplies a gun, even though recovery

---

> These considerations, however, cannot be permitted to obscure the fact that a vehicle owner who has the right and ability to control the use of the vehicle and takes no action to prevent the continued use of the vehicle by a borrower who the owner knows is likely to operate the vehicle while intoxicated is also engaged in morally reprehensible behavior that should be discouraged. Comparative negligence provides the appropriate framework for examining any negligence on the part of the individual who drives after consuming alcoholic beverages.

*Casebolt v. Cowan*, 829 P.2d 352, 362 (Colo. 1992). Other jurisdictions disagree and conclude that public policy *disfavors* recovery for voluntarily intoxicated adults in these scenarios:

> [D]enying those who drive another's vehicle while intoxicated the ability to be compensated by the entrustor properly distributes the incentive to control irresponsible drinking between the entrustor and the entrustee . . . .

*Bailey v. State Farm Mut. Auto. Ins. Co.*, 881 N.E.2d 996, 1003 (Ind. Ct. App. 2008) (internal quotation marks omitted) (citing Kayce H. McCall, Note, *Lydia v. Horton: You No Longer Have To Protect Me From Myself*, 55 S.C. L. REV. 681, 694 (2004)). In South Carolina, like in Utah, first-party recovery is not permitted by intoxicated individuals against tavern owners under its Dramshop Act. And in its *Lydia v. Horton* decision, the South Carolina Supreme Court extended this principle to the negligent entrustment context, concluding that first-party recovery was *also* barred by identical public-policy principles. 583 S.E.2d 750, 753–54 (S.C. 2003).

[57] *E.g.*, *Wilcox v. Wunderlich*, 272 P. 207, 210, 213–14 (Utah 1928).

[58] *Horton v. Royal Order of the Sun*, 821 P.2d 1167, 1169 (Utah 1991) ("There is no indication that the legislature intended to extend strict dramshop liability to the consumers of alcohol . . . .").

against one who furnishes alcohol is not permitted.[59] Indeed, many states have permitted first-party recovery under the theory of negligent entrustment.[60] We likewise conclude that nothing bars first-party recovery in a case such as the one at hand.

¶32 Despite this conclusion, we note that intoxicated individuals will likely find it difficult to recover for injuries that are caused, at least in part, by their own intoxication. Utah's comparative fault rule bars recovery where the plaintiff is fifty percent or more at fault.[61] Indeed, some states have concluded that the comparative fault rule completely bars first-party recovery as a matter of law because in their reasoning an intoxicated plaintiff will never be less than fifty

---

[59] *See* Ward Miller, Annotation, *Negligent Entrustment: Bailor's Liability to Bailee Injured Through His Own Negligence or Incompetence*, 12 A.L.R.4th 1062 (1982) (compiling cases) ("Courts have held that a bailor is liable to a bailee under the doctrine of negligent entrustment if the bailee is injured through his or her own negligence or incompetence and the bailor knew or should have known that the bailee was likely to injure himself or herself because of inexperience or inability in using the object of the bailment.").

[60] *Gorday v. Faris*, 523 So. 2d 1215, 1219 (Fla. Dist. Ct. App. 1988) (permitting recovery for intoxicated driver against the bailor of the vehicle); *Greenwood v. Gardner*, 366 P.2d 780, 780–82 (Kan. 1961) (permitting a ten-year-old who was injured as a result of an automobile collision to recover for his injuries against his grandfather, who loaned the ten-year-old his automobile); *Shepherd v. Barber*, 174 N.W.2d 163, 163–64 (Mich. Ct. App. 1969) (allowing a nineteen-year-old, who was incompetent to drive, to recover in a wrongful death action where the bailor lent the nineteen-year-old a truck). *But see McDermott v. Hambright*, 238 So. 2d 876, 877 (Ala. 1970) (barring recovery for bailee of vehicle, noting that "[t]he Alabama cases and the cases of other states have applied this doctrine only where a third person was injured by the negligent driving of the incompetent." (internal quotation marks omitted)).

[61] UTAH CODE § 78B-5-818(2) ("A person seeking recovery may recover from any defendant or group of defendants whose fault, combined with the fault of persons immune from suit and nonparties to whom fault is allocated, exceeds the fault of the person seeking recovery prior to any reallocation of fault made under Subsection 78B-5-819(2).").

percent at fault for injuries he or she causes.[62] But we do not agree with this reasoning, since it is not our prerogative to carve out exceptions to the comparative negligence regime established by the Utah Legislature. And a number of states are in agreement with this approach as well.[63]

---

[62] *See Bailey*, 881 N.E.2d at 1003 ("Indiana does not recognize a first-party cause of action for negligent entrustment of a motor vehicle to a voluntarily intoxicated adult."); *Lydia*, 583 S.E.2d at 752 ("We believe that this state's modified comparative negligence system also bars an intoxicated adult's recovery on a first party negligent entrustment cause of action. We cannot imagine how one could be more than fifty percent negligent in loaning his car to an intoxicated adult who subsequently injured himself."); *see also* Mark S. Cohen, Annotation, *Proof of Negligent Sale, Entrustment, or Storage of Firearm*, 37 AM. JUR. PROOF OF FACTS 3d 1, § 28 (1996) (discussing the comparative fault rule in the negligent entrustment context); Ward Miller, Annotation, *Negligent Entrustment: Bailor's Liability to Bailee Injured Through His Own Negligence or Incompetence*, 12 A.L.R. 4th 1062 (1982) ("However, although holding that a bailee, who alleges that it was negligence for a bailor to entrust him or her with a certain object, has stated a valid cause of action, courts have indicated a willingness to allow traditional defenses of contributory negligence or assumption of the risk to bar recovery in some cases.").

[63] *See*, *e.g.*, *Blake v. Moore*, 208 Cal. Rptr. 703, 707 (Ct. App. 1984) ("[The plaintiff] is entitled to a comparative fault trial. This should result in a weighing of [the] defendant's fault in entrusting his car to [the] plaintiff with knowledge of the intoxication, and the fault of [the] plaintiff in drinking and then driving."); *Casebolt*, 829 P.2d at 361 ("Consideration of the relevant policy factors persuades us that entrustment of an automobile to one who is likely to operate it under the influence of intoxicating liquor soon after obtaining possession of the vehicle presents an *unreasonable* risk of physical harm to the entrustee and others."); *id.* at 362 ("Comparative negligence provides the appropriate framework for examining any negligence on the part of the individual who drives after consuming alcoholic beverages."); *Gorday v. Faris*, 523 So. 2d 1215, 1218 (Fla. Dist. Ct. App. 1988) (agreeing with a case which held "that an adult drunken driver who injures himself is entitled to a comparative fault trial predicated on the theory of negligent entrustment"); *King v. Petefish*, 541 N.E.2d 847, 852 (Ill. App. Ct. 1989) ("We find section 390 of the Restatement is appropriately applied to negligent entrustment cases of the type before us and hold, by that authority, a suit brought by an injured

Continued

¶33 In sum, Utah public policy supports imposing a duty on gun owners to exercise reasonable care in supplying their guns to others—such as children and incompetent or impaired individuals—whom they know, or should know, are likely to use the gun in a manner that creates a foreseeable risk of injury to themselves or third parties. And although there are competing social policies that favor and disfavor first-party recovery by an intoxicated individual, nothing bars first-party recovery as a matter of law. As a result, Ms. Creager's estate may argue for recovery, but the estate must overcome the high hurdle of comparative negligence in order to prevail, as would any plaintiff whose injury occurs while he or she is voluntarily intoxicated.

*C. Acts vs. Omissions*

¶34 Next, we look to the tortious conduct at issue to assess whether it constituted an act or omission.[64] This distinction "makes a critical difference" because a duty of care usually only arises in the case of affirmative acts (sometimes termed "misfeasance"), or where an individual's "active misconduct work[ed] positive injury to others."[65] By contrast, an omission (sometimes termed "nonfeasance"), or "a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the defendant . . . generally implicates a duty only in cases of special legal relationships."[66]

---

entrustee against his entrustor is a viable cause of action in a comparative negligence jurisdiction.").

[64] *Jeffs*, 2012 UT 11, ¶¶ 5, 7.

[65] *Id*. ¶ 7 (internal quotation marks omitted).

[66] *Id*. (internal quotation marks omitted). We note that the nomenclature here has caused some confusion. Indeed, in *Jeffs*, we used the terms "acts and omissions" as well as "misfeasance and nonfeasance." 2012 UT 11, ¶ 7. Both sets of terms are clear enough in most cases. But the term "omission" can be somewhat misleading because, as we recently explained in *Cope v. Utah Valley State College*, "[a]ctive misfeasance . . . is not confined to situations where an affirmative act directly causes harm to the plaintiff." 2014 UT 53, ¶ 35. In other words, in some cases an "omission" may give rise to a duty even where there is no special relationship. This is because "omission" may well be understood in some contexts as failing to do what one is obligated to do. A pure omission, or passive inaction, on

Continued

¶35 Modern negligence law is built upon this important distinction between acts and omissions, which Justice Cardozo famously described in *H.R. Moch Co. v. Rensselaer Water Co.*:

> A time-honored formula often phrases the distinction as one between misfeasance and nonfeasance. Incomplete the formula is, and so at times misleading. Given a relation involving in its existence a duty of care irrespective of a contract, a tort may result as well from acts of omission as of commission in the fulfillment of the duty thus recognized by law. What we need to know is not so much the conduct to be avoided when the relation and its attendant duty are established as existing. What we need to know is the conduct that engenders the relation. It is here that the formula, however incomplete, has its value and significance. If conduct has gone forward to such a stage that [inaction] would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward. . . . The query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good.[67]

This distinction is key, since a duty will arise *only* where an alleged tortfeasor's conduct "has gone forward to such a stage that [inaction] would commonly result" in an injury.[68] Stated differently, an alleged tortfeasor's conduct must have created a situation where harm will commonly or foreseeably result, such that his inaction would permit the already advancing, foreseeable harm to work its course. In cases where a gun owner has supplied another with a gun, the question

---

the other hand, is more divorced from the concept of duty and may better describe the "nonfeasance" or "bystander" scenario envisioned by the Restatement (Second) of Torts, which permits "one human being, seeing a fellow man in dire peril, . . . [to] sit on the dock, smoke his cigar, and watch the other drown." RESTATEMENT (SECOND) OF TORTS § 314 cmt. c (1965).

[67] 159 N.E. 896, 898 (N.Y. 1928) (citations omitted).

[68] *Id.*

could be framed as "whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm,"[69] meaning whether he has placed others in harm's way by supplying an impaired or incompetent individual with a gun.

¶36 Here, Ms. Creager's estate has conceded that no special relationship existed.[70] Consequently, in order to prevail her estate must establish that a duty existed as the result of an affirmative act. So to survive summary judgment, Ms. Creager needed to establish, at a minimum, a dispute of fact about whether Mr. Izatt's conduct was an affirmative act.[71] The district court focused on this question and determined that because there was no dispute that Ms. Creager's "possession [of the gun] was voluntary," Mr. Izatt's conduct was "nonfeasance or [an] omission and failure to act." And thus, "[u]nder any of the proffered scenarios under which Ms. Creager gained possession of the firearm," Mr. Izatt did not owe a duty. We see the matter differently.

¶37 The evidence submitted at summary judgment establishes a factual dispute about the nature of Mr. Izatt's conduct. The parties agree that Ms. Creager had a blood alcohol level of 0.25 and that Mr. Izatt "unlocked his gun safe and allowed [her] to handle his . . . handgun[,] which he knew to be loaded." But they submitted conflicting evidence about what happened next. The estate provided depositions from investigators stating that Mr. Izatt then left the room without retrieving the handgun, leaving Ms. Creager alone with the weapon. Mr. Izatt's deposition testimony diverges significantly from the estate's account—he claims he told Ms. Creager that the gun was loaded, urged her to be careful, and took the gun away from her and locked it in his safe. But somehow Ms. Creager took the gun out of the safe after Mr. Izatt walked away. There is also a third possibility—some evidence in the record suggests that Ms. Creager found the gun on Mr. Izatt's counter because, as Mr. Izatt told a 911 operator, the gun "is kind[] of always out."

---

[69] *Id.*

[70] This concession is consistent with our opinion in *Gilger v. Hernandez*, in which we held that "no special relationship exists between a host and a guest that imposes on a social host a duty either to control one guest or to protect another when one threatens to injure the other." 2000 UT 23, ¶ 17, 997 P.2d 305.

[71] *See* UTAH R. CIV. P. 56(c).

¶38 We conclude that under at least some of these scenarios, the alleged conduct constitutes an affirmative act, or misfeasance, because the tortfeasor (Mr. Izatt) by affirmative act supplied a gun to an impaired individual (Ms. Creager), and thereby created a situation where harm would commonly or foreseeably result. In so doing, we clarify that in cases involving use of a gun, such as this one, the affirmative act giving rise to a duty may be (1) directly supplying or handing a gun to another, (2) placing the gun within reach of another, or (3) consenting (either explicitly or implicitly) to the use of the gun by another. We of course do not decide whether the specific factual scenarios alleged by the parties fit any of these categories. That is a decision for the fact finder below. While there was some consistency in the parties' descriptions of Mr. Izatt's preliminary actions, there was clearly a dispute of fact about whether Mr. Izatt allowed Ms. Creager to handle the gun or whether he locked it in the safe to prevent her from accessing it. Placing a gun within reach of an intoxicated individual by leaving it on a counter top or opening a safe and consenting to his or her use of a weapon certainly constitutes an overt act, not an omission. Accordingly, the district court erred in characterizing the conduct under each possible scenario as nonfeasance and concluding that no duty existed as a matter of law. Depending on the decision of the fact finder below, this factor may or may not weigh in favor of imposing a duty.

### D. Best Suited to Prevent Injury

¶39 The final factor we review is the "public policy as to which party can best bear the loss occasioned by the injury."[72] In doing so, we do not consider the relative "depth of [the parties'] pockets."[73] Rather, we assess "whether the defendant is best situated to take reasonable precautions to avoid injury."[74] Where firearms and impaired individuals are at issue, "[t]he risk and seriousness of injury that might result from [impaired individuals] taking a firearm, and thus the costs associated with not recognizing a duty in these circumstances, are high."[75] Because the burden on gun owners to properly restrict access to their firearms is relatively slight, and given the high risk of injury that may potentially result, this factor favors imposition of a duty.

---

[72] *Jeffs*, 2012 UT 11, ¶ 5 (internal quotation marks omitted).

[73] *Id.* ¶ 29.

[74] *Id.* ¶ 30.

[75] *Jupin v. Kask*, 849 N.E.2d 829, 838 (Mass. 2006).

**Conclusion**

¶40 This case involves important questions of first impression for this court regarding the duties owed by gun owners. Although the United States Constitution, as well as Utah's Constitution and statutes, clearly protect the right to own firearms, this right is not unrestricted. The Legislature has in multiple ways acted to prevent access to guns by restricted persons, minors, and those who are intoxicated. Given the minor burden imposed and the great risk where such weapons are supplied to these groups, we affirm that gun owners have a duty to exercise reasonable care in supplying their guns to others—such as children and incompetent or impaired individuals—whom they know, or should know, are likely to use the gun in a manner that creates a foreseeable risk of injury to themselves or third parties. Accordingly, we reverse the district court's determination that Mr. Izatt owed no duty of care and remand for further proceedings consistent with this opinion.

————